

ATTORNEY FOR APPELLANT

Suzy St. John
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Lakisha Jordan,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff.*

June 25, 2015

Court of Appeals Case No.
49A04-1410-CR-467

Appeal from the Marion Superior
Court

The Honorable Christina Klinemann,
Commissioner

Cause No. 49F10-1401-CM-5065

**Brown, Judge.**

[1] Lakisha Jordan appeals her convictions for resisting law enforcement as a class A misdemeanor and disorderly conduct as a class B misdemeanor. Jordan raises two issues which we consolidate and restate as whether the evidence is sufficient to sustain her convictions. We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2] On January 31, 2014, Indianapolis Metropolitan Police Officer Christopher Nieves was wearing his police uniform and driving his marked police car in the midafternoon. Officer Nieves frequently runs plates "just to check registrations and what not" and determined that the vehicle he was following was a Grand Am but the license plate was registered to a Buick. Transcript at 8. Officer Nieves then activated his lights and initiated a traffic stop of the vehicle driven by Jordan in the 3000 block of Michigan. He approached the driver's side window and asked Jordan to roll down her windows because "she had dark tinted windows." *Id.* Jordan said that the windows were broken, and Officer Nieves asked her to open her door so he could speak with her, and Jordan opened the door.

[3] Officer Nieves told Jordan why he stopped her and asked for her license and registration. Jordan gave him her license but did not have the registration or the title in the vehicle. He then asked her if she had any weapons in the car which was standard procedure for him, and Jordan immediately became belligerent. Jordan asked "very belligerently" why he asked her if she had a weapon, and Officer Nieves told her it was standard procedure. *Id.* at 10.

Jordan started yelling at him and told him he "was just asking because she was Black. Why would she have a weapon, so on and so forth." *Id.* Officer Nieves asked her to lower her voice or stop yelling, but she continued to yell. *Id.*

[4] Officer Nieves collected her information and went back to his vehicle to issue a citation. Indianapolis Metropolitan Police Officer Adrian Aurs arrived at the scene when Officer Nieves was writing the citations. At some point a tow truck was called because Jordan had a suspended license, she did not have a title to the vehicle, the license plate did not belong to the vehicle, and "the VIN was also expired." *Id.* at 22.

[5] When Officer Nieves returned to Jordan's vehicle to give her the citations and inform her that she could retrieve anything out of the vehicle because he was going to impound it, Jordan was "very angry," yelled at him, and was "talking over [him] to the point where [he] could not even describe the citation to her, what [he] was giving her, etc." *Id.* at 11. Officer Nieves and Officer Aurs asked Jordan to stop yelling multiple times. Jordan continued to yell, yelled expletives, screamed over Officer Nieves, and called him a motherf----- on several occasions. She cursed at the officers, used vulgarities, and said the officers "just stopped her because she was Black, and [they] needed religion," and that they "couldn't handle a Black woman." *Id.* at 25. Jordan said: "Ya'll think you run this place, and you're giving me a citation because I'm Black." *Id.* at 12. Officer Nieves "could never give her the citation, explain what it was, how long she had to pay it, etc." *Id.* However, he eventually gave her the citations and confirmed that she had her property out of the car.

[6]     There was a liquor store in the vicinity and a convenience store on the corner directly west of the location and it was "mostly residential right there." *Id.* at 17. "People in the liquor store lot and across the street came out to see what the commotion was." *Id.* at 26. Jordan was "being very loud and causing a scene there." *Id.* at 25-26.

[7]     Officer Nieves asked Jordan if she had everything out of the vehicle, and Jordan said that she did. She stood five or ten feet from the wrecker driver trying to hook up her vehicle and continued to scream and yell expletives at Officer Nieves and Officer Aurs. Officer Nieves kept telling her to stop, that she was free to leave, that she needed to go, and to be quiet, and Jordan said that she did not need to go.

[8]     At some point, after Jordan refused to be quiet, Officer Nieves told her that she was under arrest and made a movement toward her to put her in handcuffs, and as soon as he stepped toward her, Jordan did "an immediate 180 and turn[ed] the other direction." *Id.* at 13. She "attempted to run the other direction away from" Officer Nieves. *Id.* She had "a hard time getting some traction on the concrete" due to the ice and snow, and Officer Nieves followed behind her and "had to basically run after her" and was able to grab her shoulder after about four or five steps and pull her into him. *Id.* at 13, 27. As soon as he grabbed her right shoulder, Jordan yanked her shoulder away, twisted and turned, and started "firing her arms and pulling her body away from [him] so that [he] could not get control of her." *Id.* at 14. He pulled her in toward him, and swept her legs out from under her to "get her on the ground." *Id.* Jordan fell

"face forward on some snow that was right next to the concrete that she was running on." *Id.* at 14-15. Officer Nieves then tried to put her in handcuffs, and she kept trying to slip her wrists out of his hands. Officer Nieves finally was able to handcuff her.

[9] On February 1, 2014, the State charged Jordan with Count I, resisting law enforcement as a class A misdemeanor; Count II, resisting law enforcement as a class A misdemeanor; and Count III, disorderly conduct as a class B misdemeanor.[1]

[10] On September 8, 2014, the court held a bench trial. Officers Nieves and Aurs testified to the foregoing. During cross-examination, defense counsel asked Officer Nieves if Jordan mentioned any other documents that were forgotten in the car while it was being raised on the tow truck, and Officer Nieves said: "No." *Id.* at 16. At one point, Officer Aurs testified that Jordan tried to pull her arm away when Officer Nieves was trying to put a handcuff on her, that she was trying to jerk away, that she was still yelling, and that he remembered "her purse was still caught up in her arms when [Officer Nieves] was cuffing her up." *Id.* at 27.

[11] After the close of the State's evidence, Jordan moved to dismiss all three counts. Her counsel argued that Jordan's statements regarding her race and her

---

[1] Count I alleged that Jordan fled from Officer Nieves and/or Officer Aurs, and Count II alleged that she resisted, obstructed, or interfered with Officer Nieves and/or Officer Aurs.

perception of police treatment toward her reflected nationwide political discourse. After some discussion, the court granted the motion to dismiss as to Count I because it did not think Jordan "was able to get very far, nor was there enough time for him to like tell her to stop," and "her actions go more towards intentionally, forcibly resisting, not necessarily fleeing." *Id.* at 40. The court denied the motion with respect to the other counts.

[12] Jordan testified that she had no interactions with law enforcement before this incident, that her tone with the officers was "talking regular" before the officers towed her car, that her tone was still "regular" after the officers towed her car until she asked to retrieve the bill of sale from the car and one of the officers told her it was too late. *Id.* at 41. She testified that she did not leave the scene because the car belonged to her boyfriend and his school was right up the street, that she was never told she was under arrest, and that she did not hear any statements asking her to stop. When asked what movements she made after the officer grabbed her, Jordan answered: "I don't remember any movements. There might have been a tug, but I can't – I don't remember there being – I don't even remember anybody tugging at me to where it – because – at me being forceful for any reason. So, I don't recall any, any of that." *Id.* at 43. When asked to describe the area, Jordan mentioned a gas station, a supermarket, and houses.

[13] After closing argument, the court stated: "I just don't think it rises to the level of political speech. I think it was unreasonable, and she was given the opportunity to relax and she just didn't – couldn't do it." *Id.* at 50. The court found her

guilty of Counts II and III, and sentenced her to 365 days for Count II, resisting law enforcement as a class A misdemeanor, and 180 days for Count III, disorderly conduct as a class B misdemeanor, all suspended except for time served.

## Discussion

[14] The issue is whether the evidence is sufficient to sustain Jordan's convictions. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

A. *Disorderly Conduct*

[15] Jordan challenges whether the evidence is sufficient to sustain her conviction for disorderly conduct, with particular emphasis on whether her speech constituted free speech under the Indiana Constitution. The offense of disorderly conduct as a class B misdemeanor is governed by Ind. Code § 35-45-1-3, which provides that "[a] person who recklessly, knowingly, or intentionally

. . . makes unreasonable noise and continues to do so after being asked to stop . . . commits disorderly conduct, a Class B misdemeanor."

[16] The constitutionality of the disorderly conduct statute is determined on an as applied basis under Article 1, section 9 of the Indiana Constitution. Article 1, section 9 provides: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible." Jordan argues that her speech was "objectively political." Appellant's Brief at 6. She contends that her speech focused on race and the officers' treatment of her as an African-American woman, that using profanity does not vitiate otherwise political expression, and that she criticized police conduct. She asserts that she would not know that police may randomly check license plates to determine if they match the car and conduct a traffic stop because she had no prior involvement with law enforcement, and "having committed no other apparent violation, she was not unreasonable to deduce that Officer Nieves 'stopped her because she was Black.'" *Id.* at 7 (quoting Transcript at 26). She concedes that police may ask the driver if there are weapons in the car, but asserts that she would not know this because she had no prior dealings with law enforcement and could reasonably infer the inquiry was an assumption based on her race. She argues that her expression did not cause actual discomfort to persons of ordinary sensibilities or interfere with anyone's comfortable enjoyment of privacy, and that her speech did not prevent the officers from performing their duties.

[17] The State argues Jordan has not met her burden to show that her dual nature speech is political and that her conviction should be affirmed under rationality review. The State also contends that even if Jordan's speech is political, Jordan abused her right to speak. The State points to the facts that Jordan's yelling caused nearby citizens to stop and watch the incident, Officer Nieves was unable to give Jordan the citations or explain them due to her screaming, and that she made false and defamatory comments about the alleged racially discriminatory motivations of Officer Nieves. The State also asserts that "[w]hen a person screams a loud, baseless accusation of racism, it has the potential to both injure the individual officer's reputation in the community in which he works and potentially cause others nearby to also enter the encounter, creating a chaotic and dangerous situation." Appellee's Brief at 13.

[18] We employ a two-step inquiry in reviewing the constitutionality of an application of the disorderly conduct statute. *Barnes v. State*, 946 N.E.2d 572, 577 (Ind. 2011), *clarified on reh'g*, 953 N.E.2d 473. We "determine whether state action has restricted a claimant's expressive activity" and "decide whether the restricted activity constituted an 'abuse' of the right to speak." *Id.* (quoting *Whittington v. State*, 669 N.E.2d 1363, 1367 (Ind. 1996)).

[19] The first prong may be satisfied based solely on the police restricting a claimant's loud speaking during a police investigation. *Id.* (citing *Whittington*, 669 N.E.2d at 1370). Here, the record reveals that Jordan was arrested for disorderly conduct after she screamed and swore at the officers. Jordan has established that the State restricted her expressive activity. *See Johnson v. State*,

719 N.E.2d 445, 449 (Ind. Ct. App. 1999) (holding that a person's conviction for making unreasonable noise based on loud speaking during a police investigation constitutes state action restricting defendant's expressive activity).

[20] We now turn to whether the restricted activity constituted an "abuse" of the right to speak. This second prong hinges on whether the restricted expression constituted political speech. *Barnes*, 946 N.E.2d at 577 (citing *Whittington*, 669 N.E.2d at 1369-1370). If the claimant demonstrates under an objective standard that the impaired expression was political speech, the impairment is unconstitutional unless the State demonstrates that the "magnitude of the impairment" is slight or that the speech amounted to a public nuisance such that it "inflict[ed] 'particularized harm' analogous to tortious injury on readily identifiable private interests." *Id.* (quoting *Whittington*, 669 N.E.2d at 1369-1370 (quoting *Price v. State*, 622 N.E.2d 954, 964 (Ind. 1993), *reh'g denied*)). "If the expression, viewed in context, is ambiguous, it is not political speech, and we evaluate the constitutionality of the impairment under standard rationality review." *Id.* (quoting *Whittington*, 669 N.E.2d at 1370). Where expression is not political, we must apply rationality review in determining whether the state could reasonably have concluded that the defendant's expressive activity, because of its volume, was an "abuse" of the right to speak or was, in other words, a threat to peace, safety, and well-being. *Whittington*, 669 N.E.2d at 1371.

[21] Expressive activity is political, for the purposes of the responsibility clause, if its point is to comment on government action and includes criticizing the conduct

of an official acting under color of law. *Id.* at 1370. "[W]here an individual's expression focuses on the conduct of a private party—including the speaker himself or herself—it is not political." *Id.* The burden of proof is on the claimant to demonstrate that her expression would have been understood as political. *Id.* If the expression, viewed in context, is ambiguous, a reviewing court should find that the claimant has not established that it was political and should evaluate the constitutionality of any state-imposed restriction of the expression under standard rationality review. *Id.*

[22] The State cites *Blackman v. State*, 868 N.E.2d 579 (Ind. Ct. App. 2007), *trans. denied*, in support of its argument that Jordan's speech was not political. In *Blackman*, Latoya Blackman was sitting in the back seat of a parked vehicle. 868 N.E.2d at 582. Blackman's brother was seated next to her, and her sister was in the front seat. *Id.* Indianapolis Police Officer Brent Brinker approached the vehicle and arrested Blackman's brother on narcotics charges pursuant to an ongoing investigation. *Id.* Officer Brinker advised Officer Emily Perkins that he had observed a "substantial amount of forward movement" in the backseat of the vehicle and asked Officer Perkins to conduct a pat down search of Blackman's outer clothing. *Id.* When Officer Perkins asked Blackman to exit the vehicle, Blackman became belligerent and loud. *Id.* at 582-583. Both during and after the pat down search, Blackman repeatedly shouted "this is f* * *ing bulls* * *," and "this [is] unconstitutional." *Id.* at 583. She also asked, "[W]hy are you treating us like animals?" and "Why are you talking down to me?" *Id.* Officer Perkins' search yielded no evidence, and she instructed

Blackman to leave the scene. *Id.* Blackman refused, shouting that "she had every right to be there, that she did not have to leave the scene." *Id.* Blackman raised her voice increasingly louder, ultimately shouting loudly enough to draw a crowd. *Id.* Despite being asked to leave at least five times, Blackman remained at the scene. *Id.* At one point, she stepped aggressively close to Officer Perkins and shouted at her, pointing her finger in Officer Perkins' face. *Id.* When Officer Brinker turned his back to Blackman, she followed him, still shouting and pointing her finger at him. *Id.* Officer Perkins then handcuffed Blackman and advised her she was being arrested for disorderly conduct. *Id.*

[23] On appeal, the court observed that some of Latoya Blackman's outbursts were political in nature because she was criticizing the conduct of officers. *Id.* at 585-586. Specifically, Blackman's comment – "this [is] unconstitutional" – was directed to the legality and appropriateness of the pat-down search and the repeated orders that she leave the scene of the investigation. *Id.* at 586. On the other hand, Blackman's comment that "'she had every right to be there, that she did not have to leave the scene,' constituted expression focused on the conduct of a private party, Blackman herself." *Id.* This court held that Blackman was saying nothing about State action and that "this comment could be construed to reflect nothing more than [Blackman's] opinion that [s]he can do what [s]he wants, when [s]he wants." *Id.* (quoting *Johnson*, 719 N.E.2d at 449). The court held that "[t]his dual nature of Blackman's outbursts, coupled with her unreasonable noise levels, her refusal to comply with the officers' instructions, and the resulting disruption of the police investigation, lead us to conclude that

although Blackman's expressive activity began as political speech, it did not end as such." *Id.* The court concluded that Blackman's speech was ultimately ambiguous as to whether she was commenting on her own conduct or that of the officers and that her expression was not political and therefore subject to rational review. *Id.*

[24] The State asserts that Jordan's statements asking why would she have a weapon, that the officers needed religion, and that they "couldn't handle a Black woman," did not constitute political speech. Transcript at 26. However, we cannot say that these statements focused on her conduct as opposed to the officers' conduct. Officer Nieves testified that he kept telling Jordan that she needed to go and that Jordan told him that she did not need to go. We view this statement as a comment on police authority. Also, unlike the present case, *Blackman* involved a police investigation of narcotics and the defendant in that case stepped aggressively close to the officer and pointed her finger in the officer's face. Under the circumstances, we conclude that Jordan's overall complaint and the aim or focus of her statements was to criticize the actions of the police, and thus her speech was political. *See Price*, 622 N.E.2d at 957, 961 (holding that the defendant's overall complaint which included her statement that she had not done anything after being threatened with arrest constituted political speech); *Dallaly v. State*, 916 N.E.2d 945, 953 (Ind. Ct. App. 2009) (concluding that the aim or focus of the defendant's expressive activity was to criticize the actions of the police officers and constituted political expression); *U.M. v. State*, 827 N.E.2d 1190, 1193 (Ind. Ct. App. 2005) (holding that the

defendant's speech in regard to his companion's inability to hold up his arms was an expression regarding the legality and appropriateness of police conduct toward his companion); *Johnson v. State*, 747 N.E.2d 623, 630-631 (Ind. Ct. App. 2001) (holding that the defendant criticized the conduct of an official acting under color of law and that this speech was protected political speech).

[25] As noted, if the claimant demonstrates under an objective standard that the impaired expression was political speech, the impairment is unconstitutional unless the State demonstrates that the "magnitude of the impairment" is slight or that the speech amounted to a public nuisance such that it "inflict[ed] 'particularized harm' analogous to tortious injury on readily identifiable private interests." *Barnes*, 946 N.E.2d at 577 (quoting *Whittington*, 669 N.E.2d at 1369-1370 (quoting *Price*, 622 N.E.2d at 964)). We cannot say that the State demonstrated that the magnitude of the impairment was slight. Nor can we say that the harm suffered by the people in the liquor store lot and across the street rose above the level of a fleeting annoyance or that the State demonstrated that the speech amounted to a public nuisance such that it inflicted particularized harm analogous to tortious injury on readily identifiable private interests. Accordingly, we conclude that Jordan may not be punished, consistent with the Indiana Constitution, for her particular speech. *See Price*, 622 N.E.2d at 964-965.

B. *Resisting Law Enforcement*

[26] Jordan also challenges whether the evidence was sufficient to convict her of resisting law enforcement as a class A misdemeanor. Initially, we observe that "in Indiana the general rule is that 'a private citizen may not use force in resisting a peaceful arrest by an individual who he knows, or has reason to know, is a police officer performing his duties regardless of whether the arrest in question is lawful or unlawful.'" *Johnson*, 747 N.E.2d at 632 (quoting *Casselman v. State*, 472 N.E.2d 1310, 1315 (Ind. Ct. App. 1985) (quoting *Williams v. State*, 160 Ind. App. 294, 311 N.E.2d 619, 621 (1974))).

[27] The offense of resisting law enforcement as a class A misdemeanor is governed by Ind. Code § 35-44.1-3-1, which provides that "[a] person who knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties . . . commits resisting law enforcement, a Class A misdemeanor . . . ." Thus, to convict Jordan of resisting law enforcement as a class A misdemeanor, the State needed to prove that she knowingly or intentionally forcibly resisted, obstructed, or interfered with Officer Nieves and/or Officer Aurs while they were lawfully engaged in the execution of their duties.

[28] Jordan asserts that her actions of turning away from the encounter and leaning or pulling away from Officer Nieves's grasp showed no force. She contends that the most reasonable inference from the evidence is that she did not comply

with handcuffing at first because her purse was tangled in her arms. The State argues that the evidence is sufficient and that the evidence most favorable to the verdict shows that Jordan "'tried to jerk away,' 'fir[ed] her arms and pull[ed] her body away . . . so that [Officer Nieves] could not get control of her,' moved her arms and wrists to avoid being handcuffed, and 'tr[ied] to jerk away.'" Appellee's Brief at 15.

[29] The Indiana Supreme Court has held that "[s]uch a seemingly simple statute . . . has proven to be complex and nuanced in its application." *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013). In *Spangler v. State*, 607 N.E.2d 720, 722-723 (Ind. 1993), the Indiana Supreme Court held that the word "forcibly" is an essential element of the crime and modifies the entire string of verbs—resists, obstructs, or interferes—such that the State must show forcible resistance, forcible obstruction, or forcible interference. The Court also held that the word meant "something more than mere action." *Spangler*, 607 N.E.2d at 724. "[O]ne 'forcibly resists' law enforcement when strong, powerful, violent means are used to evade a law enforcement official's rightful exercise of his or her duties." *Id.* at 723. "[A]ny action to resist must be done with force in order to violate this statute. It is error as a matter of law to conclude that 'forcibly resists' includes all actions that are not passive." *Id.* at 724.

[30] "But even so, 'the statute does not demand complete passivity.'" *Walker*, 998 N.E.2d at 727 (quoting *K.W. v. State*, 984 N.E.2d 610, 612 (Ind. 2013)). In *Graham v. State*, 903 N.E.2d 963, 965 (Ind. 2009), the Court clarified that "[t]he force involved need not rise to the level of mayhem." "In fact, even a very

'modest level of resistance' might support the offense." *Walker*, 998 N.E.2d at 727 (quoting *Graham*, 903 N.E.2d at 966) ("even 'stiffening' of one's arms when an officer grabs hold to position them for cuffing would suffice")). The Indiana Supreme Court held:

> So in summary, not every passive—or even active—response to a police officer constitutes the offense of resisting law enforcement, even when that response compels the officer to use force. Instead, a person "forcibly" resists, obstructs, or interferes with a police officer when he or she uses strong, powerful, violent means to impede an officer in the lawful execution of his or her duties. But this should not be understood as requiring an overwhelming or extreme level of force. The element may be satisfied with even a modest exertion of strength, power, or violence. Moreover, the statute does not require commission of a battery on the officer or actual physical contact— whether initiated by the officer or the defendant. It also contemplates punishment for the active threat of such strength, power, or violence when that threat impedes the officer's ability to lawfully execute his or her duties.

*Id.*

[31] In *Berberena v. State*, which is cited by Jordan, a police officer "gave several loud verbal commands" for Edwin Berberena to stop. 914 N.E.2d 780, 780-781 (Ind. Ct. App. 2009), *trans. denied*. The police officer ordered Berberena to put his hands behind his back, but Berberena did not comply. *Id.* at 781. The officer then "had to forcefully place [Berberena] against the wall of the building. [Berberena's] chest was facing the building, and [the officer] had to struggle with him to grab his hands and place them in handcuffs." *Id.* The trial court found Berberena guilty of resisting law enforcement. *Id.* On appeal, the court

held that the officer's testimony "that he struggled to place the handcuffs on Berberena's wrists [was] ambiguous." *Id.* at 782. The court also observed that the officer "did not testify, and there [was] no evidence, that Berberena stiffened his arms or otherwise 'made threatening or violent actions' to contribute to the struggle." *Id.* (quoting *Ajabu v. State*, 704 N.E.2d 494, 496 (Ind. Ct. App. 1998)). Lastly, the court observed that the officer "could not remember what Berberena was doing with his hands, and the struggle did not last very long." *Id.* The court concluded that the evidence was insufficient to support Berberena's conviction. *Id.* at 783.

[32] Jordan also cites *Colvin v. State*, 916 N.E.2d 306 (Ind. Ct. App. 2009), *trans. denied*. In that case, Curtis Colvin kept his hands in his pockets during a struggle with officers and did not comply with officers' commands, and the officers had to use force to execute the arrest. 916 N.E.2d at 309. The State did not present any evidence that Colvin used force or made threatening or violent actions to contribute to the struggle with the officers. *Id.* The court held that the evidence did not support a reasonable inference that Colvin did more than passively resist the officers. *Id.*

[33] Here, unlike in *Berberena* and *Colvin*, we cannot say that the State did not present any evidence that Jordan used force. After Officer Nieves told Jordan that she was under arrest and made a movement toward her to put her in handcuffs, Jordan did "an immediate 180," and attempted to run the other direction. Transcript at 13. Officer Nieves followed Jordan, and as soon as he grabbed her right shoulder, Jordan yanked her shoulder away, twisted and

turned, and started "firing her arms and pulling her body away from [him] so that [he] could not get control of her." *Id.* at 14. While Officer Nieves tried to place handcuffs on Jordan, she kept trying to slip her wrists out of his hands. Officer Aurs testified that when Officer Nieves grabbed her to put her in handcuffs, Jordan tried to "jerk away." *Id.* at 27.

[34] Based upon the record, we conclude that there exists evidence of probative value from which a reasonable trier of fact could find that Jordan exercised at least a modest exertion of strength, power, or violence that impeded the officer in the lawful execution of his duties, and that she was guilty beyond a reasonable doubt of resisting law enforcement as a class A misdemeanor. *See Lopez v. State*, 926 N.E.2d 1090, 1093-1094 (Ind. Ct. App. 2010) (holding that the evidence was sufficient to prove that the defendant acted with the requisite force in resisting the officers in the execution of their duties where the defendant refused to stand and "started to pull away" when the officers tried to physically pull him up from the couch and where the officers were unable to pull his arms out from under the defendant), *trans. denied*; *Johnson v. State*, 833 N.E.2d 516, 518-519 (Ind. Ct. App. 2005) (holding that the defendant forcibly resisted police officers by turning away and pushing away with his shoulders as they attempted to search him, refusing to enter the transport vehicle, and stiffening up, thus requiring the officers to exert force to place him inside the transport vehicle).

## *Conclusion*

[35] For the foregoing reasons, we affirm Jordan's conviction for resisting law enforcement as a class A misdemeanor, reverse her conviction for disorderly

conduct as a class B misdemeanor, and remand for entry of an acquittal on the disorderly conduct count.

[36] Affirmed in part, reversed in part, and remanded.

Crone, J., and Pyle, J., concur.