

FILED

Aug 26 2016, 8:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Koethe
LaPorte, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dorothy Williams,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | August 26, 2016<br><br>Court of Appeals Case No.<br>46A03-1511-CR-1913<br><br>Appeal from the LaPorte Superior Court<br><br>The Honorable Michael S. Bergerson, Judge<br><br>Trial Court Cause No.<br>46D01-1411-F5-433 |

**Najam, Judge.**

## Statement of the Case

[1]    Dorothy Williams appeals from her conviction for disorderly conduct, as a Class B misdemeanor, following a jury trial. She asserts on appeal that there is insufficient evidence to support her conviction because her conviction was

based on political speech, which Williams raised as an affirmative defense under article 1, section 9 of the Indiana Constitution. Where, as here, the defendant is not the original subject of a police investigation,[1] the defendant demonstrates that her expression was unambiguous political speech when she shows that the focus of her speech exclusively concerned government action. Such speech must both be directed at state actors and refer to state actors or their conduct. Speech directed toward a private party or that refers to a private party, or the conduct of a private party, is politically ambiguous for purposes of an affirmative defense under art. 1, sec. 9. And when the focus of speech is politically ambiguous, a reasonable fact-finder may reject the asserted affirmative defense.

[2] If the defendant does not meet her burden of showing that her speech was unambiguously political, the State's impairment of her speech—e.g., the defendant's arrest for disorderly conduct—is constitutional so long as the State acted rationally in impairing the speech. However, if the defendant meets her burden of showing unambiguous political speech, the burden shifts to the State to demonstrate that the defendant's exercise of her speech was an abuse of her right to that expression. While the words used by the defendant do not matter to this analysis, the State can meet this heightened burden in either of the

---

[1] Our supreme court has held that a person of interest to an investigation who refuses to cooperate with an investigating officer is not protected by the political-speech defense under art. 1, sec. 9. *Barnes v. State*, 946 N.E.2d 572, 578 (Ind.), *aff'd on reh'g*, 953 N.E.2d 473 (2011), *superseded by statute on other grounds*, *see Cupello v. State*, 27 N.E.3d 1122, 1124 (Ind. Ct. App. 2015).

following circumstances: (1) the defendant's volume had more than a fleeting interference with a private interest,[2] or (2) the defendant interfered with an ongoing police investigation.[3]

[3]    Here, during her encounter with police at her home, Williams directed some of her speech toward her neighbors, and she repeatedly referred to herself and her own conduct during the encounter. Accordingly, the focus of her speech was politically ambiguous for purposes of the art. 1, sec. 9 affirmative defense, and the fact-finder was free to reject Williams' affirmative defense. As her speech was politically ambiguous, the State's impairment of her speech was constitutional so long as it was rational. And it was here: the State presented evidence that some of her neighbors, while in their homes, were actually alerted to Williams' encounter with police by the volume of her speech, and the State further showed that numerous officers diverted their attention away from the task at hand because of Williams' speech. Accordingly, we affirm Williams' conviction for disorderly conduct, as a Class B misdemeanor.

---

[2] *E.g.*, *Madden v. State*, 786 N.E.2d 1152, 1157 (Ind. Ct. App. 2003) (holding that the defendant's political speech was an abuse of the right to speak when her speech was "loud enough to draw a crowd" that disrupted traffic), *trans. denied*.

[3] *E.g.*, *Dallaly v. State*, 916 N.E.2d 945, 953-54 (Ind. Ct. App. 2009) (holding that the defendant's political speech was an abuse of the right to speak when it interfered with an officer's ability to function as a law enforcement officer, which, in turn, created a traffic hazard).

## Facts and Procedural History

[4] Around 6:00 a.m. on November 21, 2014, six to ten officers of the Michigan City Police Department went to Williams' residence on Highland Avenue to serve an arrest warrant on Robert Sanders, Jr. Sanders is Williams' brother, and, according to his driver's license records, Sanders lived at Williams' residence. Williams' minor niece, V.G., also lived at that residence, as did Williams' elderly and disabled mother, Rady Sanders. Rady is paralyzed from the waist down, and Williams is responsible for Rady's care.

[5] Detective William Henderson knocked on Williams' front door, and Williams answered. Detective Henderson asked Williams if Sanders was at the residence and informed Williams that he had an arrest warrant for Sanders. Williams "started yelling" and said that Sanders was not there. Tr. at 59. Williams appeared "verbally and completely irate that [the officers] were there" and repeatedly told the officers that Sanders "didn't live there." *Id.* at 60. When Detective Henderson asked for permission to enter the residence to ensure that Sanders was not present, Williams "slammed the door in [his] face." *Id.*

[6] Detective Henderson "continued to try and [make] verbal contact" with Williams over the next ten to fifteen minutes. Williams "continued yelling" at him in response. *Id.* at 61. Detective Henderson then contacted a prosecutor and requested a search warrant.

[7] Pursuant to protocol, while they awaited the search warrant Detective Henderson instructed the other officers at the scene "to make sure that [they]

maintained a solid perimeter and nobody came in or out" of the residence. *Id.* at 62. Detective Henderson requested the presence of additional officers to assist with maintaining that perimeter. Shortly thereafter, fifteen to twenty officers total were maintaining a perimeter around Williams' residence. The officers used unmarked vehicles and did not activate any vehicular emergency lights or sirens.

[8] At approximately 7:00 a.m., Williams and V.G. exited the front door of the residence. Williams walked V.G. through the police perimeter to a nearby car, which took V.G. to her school. When Williams walked back towards her residence, Detective Henderson stopped her at the police perimeter and informed her that he could not let her reenter the residence "for safety reasons" because, first, once a person exits a surrounded residence, "it's one less person [the officers] have to worry [about] that has access to any firearms[] or anything that could harm [others]," and, second, if the subject of the search warrant is inside the residence, the person who has come outside can "see where [the officers] are tactically around [the residence], so if [the subject] were to try to plan any assault . . . [the officers will have] given up [their] positions . . . ." *Id.* at 140-41.

[9] "After informing her of that," Williams grew "irate" and began "yelling, screaming, [and] cussing" at the officers. *Id.* at 65. Detective Henderson asked her to "please be quiet" "several times," to no avail. *Id.* at 140. Officers informed Williams that she was not under arrest, and Williams loudly asked, "You mean to tell me you are not going to let me enter my motherf***ing

house?" *Id.* at 66. Williams then loudly declared, "I'm going back in my house," and that she was "going back in here to see about my mother, you know my mother's in here and she's sick, I'm going back in here to see her." *Id.* at 297-98. When informed that she would be arrested for disorderly conduct if she continued her loud outburst, Williams loudly informed the officers that she "doesn't care about going to jail." *Id.* at 66.

[10] In response to Williams' outburst, her neighbors came out of their nearby residences to see what was going on "like there was a show." *Id.* at 68, 155. When officers continued to deny Williams reentry into her residence, Williams loudly asked the officers how they could "deny my right to go back in my own home" when she had not committed any crime and was not under arrest. *Id.* at 275. Williams then proceeded to "tell my neighbors to look and see how the Michigan City police department [is] treating me . . . and an elderly woman[.]" *Id.* at 276.

[11] Williams' outburst required Detective Henderson to turn his "back to the residence[] and . . . fully engage[] . . . with Ms. Williams rather than keep[ his] post around the house," which "could've been a big danger" to Detective Henderson and other officers. *Id.* at 176. Williams' outburst also "divert[ed] some of [the] . . . officers" who were responsible for "dealing with the tactical surrounding [of] that residence" from that responsibility "[to] being concerned with [Williams'] demeanor and how she was going to react with the other officers [who] were dealing directly with her." *Id.* at 102. Williams' outburst lasted approximately two to four minutes before officers arrested her for

disorderly conduct. Upon obtaining a search warrant and searching Williams' residence, the officers found Sanders hiding in the attic.

[12] The State charged Williams with assisting a criminal, as a Level 5 felony, and disorderly conduct, as a Class B misdemeanor. A jury acquitted Williams of assisting a criminal, but it found her guilty of disorderly conduct. The trial court entered judgment and sentence accordingly. This appeal ensued.

# Discussion and Decision

## Overview

[13] Williams contends that the State presented insufficient evidence to support her conviction. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses. *Sharp v. State*, 42 N.E.3d 512, 516 (Ind. 2015). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict, and we will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

[14] To prove disorderly conduct, as a Class B misdemeanor, the State had to show that Williams recklessly, knowingly, or intentionally made unreasonable noise and continued to do so after being asked to stop. Ind. Code § 35-45-1-3(a)(2) (2014). On appeal, Williams does not suggest that the State failed to present sufficient evidence to demonstrate that she committed disorderly conduct. Rather, she maintains that the evidence underlying her conviction shows that

her speech was political speech, an affirmative defense under article 1, section 9 of the Indiana Constitution.

[15] Article 1, section 9 states: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible." As our supreme court has explained:

> Because one's conduct or expression may be free speech protected under the Indiana Constitution, an application of the disorderly conduct statute must pass constitutional scrutiny. We employ a two-step inquiry in reviewing the constitutionality of an application of the disorderly conduct statute: we (1) "determine whether state action has restricted a claimant's expressive activity" and (2) "decide whether the restricted activity constituted an 'abuse' of the right to speak." *Whittington v. State*, 669 N.E.2d 1363, 1367 (Ind. 1996). The first prong may be satisfied based solely on the police restricting a claimant's loud speaking during a police investigation.[4] *Id.* at 1370. The second prong hinges on whether the restricted expression constituted political speech. *Id.* at 1369-70. If the claimant demonstrates under an objective standard that the impaired expression was political speech, the impairment is unconstitutional unless the State demonstrates that the "magnitude of the impairment" is slight or that the speech amounted to a public nuisance such that it "inflict[ed] 'particularized harm' analogous to tortious injury on readily identifiable private interests." *Id.* (quoting *Price v. State*, 622 N.E.2d 954, 964 (Ind. 1993)). If the expression, viewed in context, is ambiguous, it is not political speech, and we

---

4 The State does not suggest that Williams failed to satisfy this requirement.

evaluate the constitutionality of the impairment under standard rationality review. *Id.* at 1370.

*Barnes v. State*, 946 N.E.2d 572, 577 (Ind.), *aff'd on reh'g*, 953 N.E.2d 473 (2011), *superseded by statute on other grounds*, *see Cupello v. State*, 27 N.E.3d 1122, 1124 (Ind. Ct. App. 2015).

[16] Here, we first consider whether Williams' speech was unambiguous political speech under art. 1, sec. 9. We then "evaluate the constitutionality" of the State's "impairment" of Williams' speech. *See id.*

## Political Speech

[17] We first consider whether Williams' speech was political speech for purposes of the art. 1, sec. 9 affirmative defense. We review the defendant's speech under an objective standard. *Id.* However, Williams carried the burden of proof to demonstrate to the fact-finder that her expression was unambiguously political. *Whittington*, 669 N.E.2d at 1370. As the fact-finder rejected her asserted defense, Williams now appeals from a negative judgment. In such appeals, "we will reverse only if the evidence is without conflict and leads inescapably to the conclusion that the [appellant] is entitled" to her requested relief. *Barnett v. State*, 867 N.E.2d 184, 186 (Ind. Ct. App. 2007), *trans. denied*.

[18] As our supreme court has explained:

> Expressive activity is political, for the purposes of [art. 1, sec. 9],
> if its point is to comment on government action, whether
> applauding an old policy or proposing a new one, or opposing a
> candidate for office or criticizing the conduct of an official acting

under color of law. The judicial quest is for some express or clearly implied reference to governmental action.

*Whittington*, 669 N.E.2d at 1370 (footnote omitted). Thus, "political expression focuses on the conduct of government officials and agents." *Id.* at 1370 n.11. "In contrast, where an individual's expression focuses on the conduct of a private party—including the speaker himself or herself—it is not political." *Id.* at 1370. And, as our case law has applied art. 1, sec. 9, expression that is directed toward a private party or refers to the conduct of a private party, even if in part, does not demonstrate protected political expression.

[19] For example, in *Price*, the defendant responded to an officer who had threatened to arrest her by saying, "F--- you. I haven't done anything." 622 N.E.2d at 957. Although the parties before the court in *Price* did not challenge whether that assertion was political, in *Whittington* the court revisited that language and concluded that it was "not political" because it was "a defense of [the defendant's] own conduct." *Whittington*, 669 N.E.2d at 1370 (discussing *Price*, 622 N.E.2d at 957). Likewise, on the facts before it in *Whittington* our supreme court concluded that the defendant's statements that he "had not done anything and that the other witnesses were lying" were not political statements because they did not refer to the conduct of state actors. *Id.* at 1366, 1370-71. The court in *Whittington* further held that other statements made by the defendant were not political because they "were not directed toward" state actors but, rather, were "directed . . . toward his sister's boyfriend, who may have been the one who summoned the police." *Id.* at 1370-71.

[20] This court has likewise concluded that speech in which the speaker refers to him- or herself, even when prompted by a police officer's conduct or statements, and even when coupled with political statements, permits a reasonable fact-finder to conclude that the focus of the entirety of the speech is ambiguous and, therefore, not political. For example, in *Anderson v. State*, 881 N.E.2d 86, 90 (Ind. Ct. App. 2008), we held that the defendant "asserting a right to be where he was, which is a comment on his own behavior," rendered his speech not political. In *Blackman v. State*, 868 N.E.2d 579, 586 (Ind. Ct. App. 2007), *trans. denied*, we held that the defendant's comment that she had "every right to be there, that she did not have to leave the scene" focused on her own conduct, and, therefore, it was not political, even though it was in direct response to officer conduct that the defendant had asserted to be unconstitutional. In *Wells v. State*, 848 N.E.2d 1133, 1150 (Ind. Ct. App. 2006), we held that a politician's statement upon arrest that he had been set up by his political adversaries was not political because it "reasonably [could] be viewed simply as an attempt . . . to 'talk his way out' of . . . further investigation . . . ." And in *Johnson v. State*, 719 N.E.2d 445, 449 (Ind. Ct. App. 1999), we held that the defendant's assertion to an officer that the defendant was not going to attend classes required for his probation was not political because it could have been interpreted as focusing on the defendant's own conduct rather than state action.

[21] However, where the defendant's speech was directed exclusively at state actors and focused exclusively on the actions or conduct of state actors, we have

repeatedly concluded that the speech is political.[5] *E.g.*, *Dallaly v. State*, 916 N.E.2d 945, 952-53 (Ind. Ct. App. 2009); *U.M. v. State*, 827 N.E.2d 1190, 1193 (Ind. Ct. App. 2005); *Madden v. State*, 786 N.E.2d 1152, 1156-57 (Ind. Ct. App. 2003), *trans. denied*; *Johnson v. State*, 747 N.E.2d 623, 630-31 (Ind. Ct. App. 2001); *Shoultz v. State*, 735 N.E.2d 818, 826-27 (Ind. Ct. App. 2000), *trans. denied*.

[22] Applying that law here, we hold that a reasonable fact-finder could have concluded that the focus of the entirety of Williams' speech was ambiguous and, therefore, not political. During her encounter with the officers outside of her house, Williams said the following: "I don't care if I go to jail"; "I'm going back in my house"; "my mother's in here and she's sick, [so] I'm going back in here to see her." Tr. at 66, 297-98. Williams also directed part of her speech toward her neighbors, stating: "look and see how the Michigan City police department [is] treating me . . . and an elderly woman[.]" *Id.* at 276. Williams' statements refer to herself or her mother; they refer to her own conduct; and they were directed at least in part toward private parties. As our case law applies art. 1, sec. 9, those statements are plainly not political. Thus, a reasonable fact-finder could have concluded that the focus of the entirety of her speech was ambiguous and, therefore, that Williams' did not meet her burden

---

[5] In one recent case, a panel of this court held that the defendant's assertion that she "did not need to go" was political in light of the overall context of her speech, which was a criticism of officers for, in the defendant's view, unjustly stopping African-Americans. *Jordan v. State*, 37 N.E.3d 525, 532-33 (Ind. Ct. App. 2015). Williams does not argue that her facts are analogous to those in *Jordan*. *See* Ind. Appellate Rule 46(A)(8)(a).

to establish her affirmative defense. Thus, we reject Williams' argument to the contrary on appeal.

## State's Impairment of Williams' Expression

[23] Having concluded that Williams' speech was not political, we next "evaluate the constitutionality of the [State's] impairment [of her expression] under standard rationality review." *Barnes*, 946 N.E.2d at 577. In that review, we determine whether the State rationally could have concluded that Williams' expressive activity, because of its volume, was an "abuse" of the right to speak. *Whittington*, 669 N.E.2d at 1371. In other words, we consider whether Williams' speech was "a threat to peace, safety, and well-being." *Id.*

[24] Applying that standard in *Whittington*, our supreme court held:

> We easily conclude that Whittington has not negated "every conceivable basis" for the state action in his case.
>
> In *Price* we abstractly observed that "abating excessive noise is an objective our legislature may legitimately pursue." On the facts of this case, it is reasonably conceivable that the loud outbursts in the concrete circumstances of this case *could* have agitated other persons in the apartment, sparked additional disruptions of [Officer] Finnell's investigation, or interfered with his ability to manage the medical crew and the alleged crime scene. The noisy tirade *could* have threatened the safety of Whittington's sister by aggravating her trauma or by distracting the medical personnel tending her injury. Finally, the volume of the speech undoubtedly made it highly annoying to all present. The state could therefore have believed Whittington's outbursts constituted an "abuse" of the right to speak and, as such, fell within the purview of the police power.

*Id.* (citations omitted; emphases added).

[25] The facts presented by the State here are far more concrete than the hypothetical harms held to be sufficient in *Whittington*. Here, the State presented evidence that, as a result of the volume of Williams' speech, her neighbors came out of their homes to see what was going on. The State also presented evidence that numerous officers were distracted from the task at hand—securing a perimeter around the residence—by Williams' outburst. As such, a reasonable fact-finder could have easily concluded that Williams' outburst was an abuse of her right to speak. Accordingly, the State's arrest of Williams was rational and, therefore, constitutional. *See Barnes*, 946 N.E.2d at 577. We affirm Williams' conviction.

## Conclusion

[26] In sum, we hold that a reasonable fact-finder could conclude that the focus of Williams' speech was politically ambiguous and, therefore, that she did not meet her burden under art. 1, sec. 9. We further hold that the State acted rationally in impairing Williams' speech. Thus, we affirm her conviction.

[27] Affirmed.

Vaidik, C.J., and Baker, J., concur.