## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 19 2020, 9:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Taylor-Price
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Reanna Lopez-Smith,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

June 19, 2020

Court of Appeals Case No.
19A-CR-3018

Appeal from the Marion Superior Court

The Honorable David J. Certo, Judge

The Honorable David M. Hooper, Magistrate

Trial Court Cause No.
49G12-1906-CM-25597

**Najam, Judge.**

# Statement of the Case

Reanna Lopez-Smith appeals her convictions for resisting law enforcement, as a Class A misdemeanor, and disorderly conduct, as a Class B misdemeanor, following a bench trial. Lopez-Smith raises a single issue for our review, namely, whether the State presented sufficient evidence to negate her affirmative defense that her conduct was protected political speech.

We affirm.

# Facts and Procedural History

In the evening hours of June 25, 2019, Indianapolis Metropolitan Police Department Officer Emily Perkins was dispatched to a reported disturbance in the 4400 block of North Linwood Drive. There, Officer Perkins learned that there had been "several incidents" between neighbors in an apartment complex there "where guns were involved." Tr. Vol. 2 at 9. Officer Perkins observed a vehicle near the reported disturbance with Lopez-Smith inside. Officer Perkins learned that Lopez-Smith had recently moved out of the apartment complex because of the disturbances.

As Officer Perkins attempted to leave the apartment complex, she observed Lopez-Smith place her vehicle "in the middle of the street, running with the lights on and the brake lights . . . on." *Id.* at 11. Officer Perkins pulled her police cruiser behind Lopez-Smith "for about 30 seconds," "expect[ing] her to leave." *Id.* But Lopez-Smith "didn't move." *Id.* Officer Perkins then "activated [her] overhead lights" and Lopez-Smith began to turn right onto an

eastbound street, but "[s]he did not turn. She almost turned. She turned back, pulled the vehicle back to the left, [and] proceeded northbound." *Id.*

[5] With Officer Perkins still following her with the cruiser's overhead lights on, Lopez-Smith turned into a Kroger's parking lot. Lopez-Smith then "ran [a] stop sign" while proceeding "30 miles per hour" through the parking lot before "pull[ing] across . . . two handicapped" spaces and parking her car there. *Id.* at 12. Lopez-Smith then opened the driver's side door of her vehicle. Officer Perkins "yelled at her to get back in the vehicle," which command Officer Perkins had to repeat. *Id.* Lopez-Smith then "s[at] down with her feet still out of the vehicle, door open, so her back was toward the passenger side." *Id.* Officer Perkins again directed Lopez-Smith "to get back in the vehicle and shut the door." *Id.*

[6] Lopez-Smith refused. She "yelled at [Officer Perkins] that she was on the phone with her mom . . . ." *Id.* A crowd of ten or so bystanders began to gather. At that point, Officer Perkins was concerned about the possibility of firearms given the history of disturbances at the apartment complex. Officer Perkins then "immediately" approached the vehicle, and at some point other officers arrived. *Id.* at 13. Lopez-Smith continued to refuse the instructions to close the vehicle door and to put down her phone, and so Officer Perkins directed Lopez-Smith to exit the vehicle. Lopez-Smith again refused and instead "twisted her body back into" the vehicle with "her legs out of the . . . driver's door" and "her body back in to where the passenger compartment is . . . ." *Id.*

Officer Perkins could not see Lopez-Smith's hands with her in that position. Accordingly, Officer Perkins "grabbed her left arm . . . in an attempt to pull her away from the center console . . . ." *Id.* at 14. Lopez-Smith "pulled back." Lopez-Smith then said, "you can't do this to me, I'm talking to my mom." *Id.* Officer Perkins told Lopez-Smith that she was under arrest for resisting, and Lopez-Smith then "twisted her body. She flailed her arms. She swung at officers. She did everything exactly the opposite of what [officers] told her to do . . . ." *Id.* Officer Perkins "had to grab onto her arm at least four times in order to get her hands behind her back" and ended up having to "tak[e] her to the ground." *Id.*

Officer Perkins later estimated that she and Lopez-Smith "fought for probably a minute or a minute and a half" before Officer Perkins and other officers were able to subdue Lopez-Smith. *Id.* While they waited for another police vehicle to escort Lopez-Smith away from the scene, Lopez-Smith continued to "scream[] and . . . yell[]." *Id.* at 15. Lopez-Smith "yelled obscenities at [the officers] and cussed [them] out," she "yelled to everyone that she could get to listen to her," and, along with that, she said the officers did not "hav[e] the right to arrest her." *Id.* at 23. By the time she was escorted away, a crowd of "20 to 25 people" had gathered at the scene. *Id.* at 15.

The State charged Lopez-Smith with resisting law enforcement, as a Class A misdemeanor, and disorderly conduct, as a Class B misdemeanor. After a bench trial in which Officer Perkins testified, the court found Lopez-Smith guilty of both offenses. This appeal ensued.

# Discussion and Decision

[10] On appeal, Lopez-Smith assets that the State failed to present sufficient evidence to negate her claim that her conduct was protected political speech under Article 1, Section 9 of the Indiana Constitution. As our Supreme Court has made clear:

> When a defendant challenges the sufficiency of the evidence supporting a conviction, we neither reweigh evidence nor judge witness credibility. Instead, this Court will consider only the evidence most favorable to the judgment together with all reasonable inferences that may be drawn from the evidence. If substantial evidence supports the judgment, we'll affirm the convictions.

*Cardosi v. State*, 128 N.E.3d 1277, 1283 (Ind. 2019) (quotation marks and citations omitted).

[11] Lopez-Smith does not dispute that the State presented sufficient evidence to meet the statutory elements of the two offenses. Rather, she asserts that the evidence required the fact-finder to conclude that her conduct was protected political speech. Article 1, Section 9 states: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible."

[12] "In reviewing an argument under Article 1, Section 9, we employ 'a two-step inquiry': first, we 'determine whether state action has restricted a claimant's expressive activity'; and, second, we 'decide whether the restricted activity

constituted an abuse of the right to speak.'" *Stone v. State*, 128 N.E.3d 475, 482 (Ind. Ct. App. 2019) (quoting *Williams v. State*, 59 N.E.3d 287, 292 (Ind. Ct. App. 2016)), *trans. denied*. With respect to the first step:

> As we have explained:
>
> > . . . the defendant demonstrates that his expression was unambiguous political speech when he shows that the focus of his speech exclusively concerned government action. Such speech must both be directed at state actors and refer to state actors or their conduct. Speech directed toward a private party or that refers to a private party, or the conduct of a private party, is politically ambiguous for purposes of an affirmative defense under art. 1, sec. 9. And *when the focus of speech is politically ambiguous, a reasonable fact-finder may reject the asserted affirmative defense*.
> >
> > If the defendant does not meet his burden of showing that his speech was unambiguously political, the State's impairment of his speech—e.g., the defendant's arrest . . . —is constitutional so long as the State acted rationally in impairing the speech.
>
> [*Williams*, 59 N.E.3d] at 289-90 (emphasis added; footnote omitted). Thus, "expression that is directed toward a private party or refers to the conduct of a private party, even if in part, does not demonstrate protected political expression" under Article 1, Section 9. *Id.* at 293. Likewise, "speech in which the speaker refers to him- or herself, even when prompted by a state actor's conduct or statements, and even when coupled with political statements, permits a reasonable fact-finder to conclude that the focus of the entirety of the speech is ambiguous and, therefore, not political." *Id.* at 294. In other words, where speech is at least in part not germane to a public issue, a trier of

fact may find the speech as a whole not protected by Article 1, Section 9. *See id.*

*Id.* at 483 (quoting *Williams*, 59 N.E.3d at 289-94) (brackets omitted; some omissions original to *Stone*).

[13] Lopez-Smith's speech was not unambiguously political as a matter of law. Part of her speech was directed toward private parties, such as her mother and bystanders. Part of her speech was self-referential, such as telling the officers that she was going to sue them.

[14] Still, Lopez-Smith asserts that the facts underlying her convictions are analogous to those in *U.M. v. State*, in which we held that the appellant's speech was protected political speech. 827 N.E.2d 1190, 1193 (Ind. Ct. App. 2005). In *U.M.*, we described the facts as follows:

> Police officers received a report of juveniles spray-painting graffiti on a garage. When Officer Laton arrived at the scene, U.M. was in the back seat of a car with another individual. Officer Laton instructed the people in the car to hold up their hands. Despite Officer Laton's directions to do so, one individual in the back seat of the car did not keep his hands up. U.M. was sitting next to this individual in the back seat of the car and yelled at Officer Laton, "F—— you, he can't keep his arms up, his arms hurt." Tr. at 14. Officer Laton told U.M. to stop yelling, and the officer then removed U.M. and the other individual from the car. U.M. continued yelling statements such as, "You guys are all racists; f——— the police." Tr. at 14. Officer Laton testified that he instructed U.M. to stop yelling two or three times and that it took U.M. two or three minutes to heed his orders. Based upon this incident, the State filed a petition alleging U.M. to be a delinquent child for committing the offense of disorderly

conduct. U.M. was found to be delinquent by the juvenile court .
. . .

*Id.* at 1191-92.

[15] We reversed the juvenile's adjudication on the ground that the "conduct" that was alleged to have been disorderly was protected political speech. As we explained:

> U.M.'s speech was in regard to his companion's inability to hold up his arms and the requirement by Officer Laton that their arms stay in the air. U.M.'s remarks were directed at Officer Laton, and Officer Laton testified that U.M. was commenting on what he was doing at the scene. Although we do not agree with the manner in which U.M. conducted himself, . . . U.M. was expressing himself regarding the legality and appropriateness of police conduct toward his companion.

*Id.* at 1193. In other words, in *U.M.*, "the defendant's speech was directed exclusively at state actors and focused exclusively on the actions or conduct of state actors." *Williams*, 59 N.E.3d at 294. But, as Lopez-Smith's conduct was not so focused, a reasonable fact-finder was free to reject her argument that her conduct was unambiguously protected political speech. *Stone*, 128 N.E.3d at 483.

[16] We thus turn to the second step of our Article 1, Section 9 inquiry. As we also explained in *Williams*:

> Having concluded that [the defendant's] speech was not political, we next evaluate the constitutionality of the State's impairment

of her expression under standard rationality review. In that review, we determine whether the State rationally could have concluded that [the defendant's] expressive activity, because of its volume, was an "abuse" of the right to speak. In other words, we consider whether [the defendant's] speech was a threat to peace, safety, and well-being.

59 N.E.3d at 295 (cleaned up).

[17] The State readily demonstrated this requirement. In *Williams*, we held that the State presented sufficient evidence of an abuse of the right to speak when the volume of the defendant's speech caused neighbors to exit their homes to see what was going on. *Id.* Likewise, here, Lopez-Smith's volume, language, and belligerence toward the officers attracted a crowd of twenty to twenty-five bystanders in the Kroger's parking lot. Accordingly, the State presented sufficient evidence to negate her affirmative defense of protected political speech under Article 1, Section 9, and we affirm her convictions.

[18] Affirmed.

Kirsch, J., and Brown, J., concur.